Richmond.

## PORTSMOUTH, BERKLEY AND SUFFOLK WATER COMPANY v. CITY OF PORTSMOUTH.

### March 9, 1911.

1. MANDAMUS—*Water Companies—Public Service Corporations.*— A water company, such as is mentioned in the case at bar, is a public service corporation, and where, by the terms of its contract with a city, it has contracted to furnish water to the city and has the exclusive privilege of using the streets of the city for the purpose of furnishing water to it and its inhabitants, the duty of furnishing water to the city for its purposes is a public duty and its performance may be enforced by mandamus.

2. WATER COMPANIES—*Metering—Case at Bar.*—Under the terms of the contract in controversy in this cause, and under the evidence, although the city was to pay a flat rate for water, the water company had the right to place meters on its connections with the city sewers, at its own expense, in order to enable it to know how much water was needed in keeping its contract with the city, or for making reasonable regulations in the use of water which would enable it to detect and prevent the water so furnished from being wasted by the negligence or carelessness of the employees of the city.

Error to a judgment of the Hustings Court of the city of Norfolk in a proceeding by mandamus.   Judgment for the petitioner.   Respondent assigns error.

*Reversed.*

The opinion states the case.

*T. J. Wool* and *Goodrich Hatton,* for the plaintiff in error.

*John W. Hopper,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

This is a mandamus proceeding instituted by the city of Portsmouth against the Portsmouth and Suffolk Water Company, to compel the latter to make certain tappings and connections between its street mains and the service pipes of the city, so as to properly connect the water of the said company with the sewerage system in the Fifth ward of the city. The relief sought by the city was granted. To that judgment this writ of error was awarded.

The court is of opinion that mandamus is a proper remedy to compel the performance of the duty which it is alleged in the pleadings of the city the water company refused to perform. Making the tappings and connections between the street mains and the service pipes of the city was necessary to properly connect the water of the water company with the sewerage system of the city in the Fifth ward. The water company is a public service corporation (Ch. 100, Acts of Assembly 1878-9, pp. 95-6; Ch. 63, Acts of Assembly 1901-2, pp. 54-5; Code 1873, Ch. 56; Const., 1902, sec. 153). By the terms of its contract with the city, it had the exclusive privilege of using the streets of the city for the purpose of furnishing water to it and its inhabitants. The duty of furnishing water for sewerage purposes for the Fifth ward of the city was one which it owed to the city, and a refusal to make the tappings and connections in question was, in effect, a refusal to furnish water for sewerage purposes in that part of the city. If this duty had been imposed by the provisions of the charter of the water company or by an ordinance of the city, under our decisions there could be no question that it was a public duty, and its performance, in a proper case, could be enforced by mandamus. *Richmond, &c. Ry. Co.* v. *Brown,* 97 Va. 26, 32 S. E. 775; *Vinton-Roanoke Water Co.* v. *City of Roanoke,* 110 Va. 661, 66 S. E. 835, and authorities cited.

The ordinance of a city prescribing the terms and conditions upon which a water company may lay its mains and

pipes in the streets of the city and furnish water to it and its inhabitants, when accepted by the water company, constitutes the contract between the city and the water company. Where the obligation on the water company is the same, it would seem to be of little consequence whether the contract between the city and the water company be in one form or in the other, as to the right to compel the performance of the duty by mandamus.

The water company, in its answer to the petition for mandamus, raised the question as to its duty to furnish without additional charge therefor water for the sewerage system in the Fifth ward of the city—territory added to the city since the contract between the city and the water company was entered into. This question was abandoned in oral argument in this court.

It appears that when the water company was requested by the city to make the tappings and connections between the mains and service pipes, it did not refuse, but expressed its willingness to do so, provided meters were installed upon each of the service connections, at the expense of the water company. This the city declined to do or permit. Thereupon, the city instituted this proceeding.

The question to be determined, upon the merits of the case, is whether or not the use of meters, as insisted upon by the water company, was justified by its contract with the city.

The provisions of the contract chiefly relied on by the parties to sustain their respective contentions are sections III, IV and V.

Section III provides, "That the said city shall have authority to lay and maintain, in good condition, suitable service pipes from said street main pipes for the supply of fire engine and hose companies' houses, court-house, jail, school houses and all other public city buildings and uses, at the expense of the said city; provided, however, that the

tapping and connections with said main pipes shall be under the control and supervision of said water company."

By section IV it is provided, "That said hydrants so set for fire purposes shall at all times be accessible to the fire department for engine and hose companies, for the extinguishing of fires and cleaning of the fire apparatus, and to the proper officers for the use thereof in sprinkling streets and flushing gutters in streets and public places, and washing out market houses and market spaces, but the water from such hydrants and service pipes shall be used only for such public purposes by the city authorities and with the necessary economy, without waste; and for sprinkling streets, shall be used only from sprinkling carts or other vessels; and no water from any such hydrants or pipes shall be used by any person for any private purpose."

Section V is as follows: "That the said city, through its agents and the fire department thereof, shall at all times exercise due caution and care in opening and closing the valves connected with said hydrants, to be used as aforesaid, and shall permit no unnecessary waste of the water in connection therewith, or in any place where water is furnished for public use, and shall use the water under the prescribed regulations of the company; provided that such regulations are not unreasonable or inconsistent with the privileges herein granted."

Under section 3 the city has the right to lay and maintain service pipes from the street mains for its public uses as therein provided, but the making of the tappings and connections by which this is done is under the control and supervision of the water company. By section 5 it is provided that wherever water is furnished for the public uses of the city it shall be used under the prescribed regulations of the water works, provided such regulations are reasonable and not inconsistent with the privileges granted by the contract. Section 4, among other things, provides, that

water from the city service pipes shall be used only for public purposes by the city authorities, and that this shall be done with economy and without waste.

The evidence shows that by the installation of the meter system in making the tappings and connections asked for by the city, the water company would be the better enabled to keep and perform its contract with the city; that the use of meters would aid the company in ascertaining accurately how much water was used in flushing the sewers and how often they were flushed, thus enabling both the city and the water company to ascertain whether or not the sewers were flushed as often as they should be for sanitary purposes and that there was no unnecessary waste of water in such flushing. It further appeared that the use of meters was the best system, if not the only practicable system, for accomplishing this.

One of the objections made by the city to the use of meters is that the water furnished to the city for its uses is furnished at a flat rate, and there is, therefore, no necessity for measuring it. This, however, does not make it any less important for the water company to know how much water is needed in keeping its contract with the city, or for making reasonable regulations in the use of water, which will enable it to detect and prevent the water so furnished from being wasted by the negligent or careless employees of the city.

Another objection is that the location of such meters would entail additional expense in maintaining and keeping its streets in order. The expense connected with the installation and maintenance of the meters was, under the proposition made to the city, to be borne by the water company alone.

The city also claims that the location of meter boxes on the streets was objectionable and would render the streets less safe. The evidence tends to show that the meters could

be placed in the flush tanks without interfering with their working, and that that is the better location for them.   If this be so, then there is no necessity for installing them in boxes in the streets.   If it be necessary, as the city officials seem to think, to place the meters in boxes located on the streets near the curbs or edges of the sidewalks, there would seem to be no serious objection to or danger resulting from such location; for it appears that a great many meters, hundreds of them, perhaps, for private residences scattered over the city, are so located.

Without discussing further the reasons for and against the installation of the meters in question, we are of opinion that the claim of the water company, that in making the tappings and connections asked for by the city in the Fifth ward it should be permitted to have meters installed at its own expense, was within its contract rights, and that the condition or regulation prescribed upon which it would make the tappings and connections asked for in the Fifth ward was not unreasonable.

It follows from what has been said that the hustings court erred in granting the writ of mandamus, that its judgment must be reversed; and this court will enter such judgment as it ought to have entered, dismissing the petition of the city at its costs.

*Reversed.*